Stephanie Pollan, OSB #064736
Attorney at Law
9900 SW Wilshire St. Suite 140
Portland, Oregon 97225
Tel: (503) 206-5292
stephanie@stephaniepollanlaw.com

CJA Panel Attorney for Ciedric Broussard

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CIEDRIC ROYCE BROUSSARD,<br><br>Defendant. | Case No. 3:23-cr-00101-SI<br><br>DEFENDANT CIEDRIC BROUSSARD'S SENTENCING MEMORANDUM |

Defendant, Ciedric Broussard, through his attorney Stephanie Pollan, hereby submits the following sentencing memorandum for the Court's review and consideration in determining a sentence that is "sufficient, but not greater than necessary," as required by 18 U.S.C. § 3553(a). On December 4, 2024, Mr. Broussard pleaded guilty to Count 1 which charges Felon in Possession of a Firearm, in violation of Title 18, United States Code Sections 922(g)(1) and Count 2 which charges Felon in Possession of Ammunition, in violation of Title 18, United States Code Sections 922(g)(1). Sentencing is scheduled for August 24, 2026, at 11:00 a.m. Mr. Broussard is out of custody and at the time of sentencing, Mr. Broussard has served two months in custody on this case.

**I. Guidelines Application and Objections**

Mr. Broussard agrees with the Presentence Report (PSR) base offense level of 22 pursuant to USSG §2K2.1(a)(3). (PSR ¶ 29). However, Mr. Broussard objects to the four-level increase to the guidelines based on USSG 2K2.1(b)(6)(B) for using or possessing the firearm during the commission of another felony offense. (PSR ¶ 30). Mr. Broussard is eligible for a three-level reduction for acceptance of responsibility under USSG §3E1.1(a) and (b)). (PSR ¶¶ 36,37) Mr. Broussard does not object that he is criminal history category IV as calculated in the PSR. Mr. Broussard argues the total offense level is 19 and not 23 (PSR ¶ 38) and submits his guideline range should be 46-57 months.

The remaining unresolved objection to the PSR is the relevancy of the inclusion of the information in paragraph 23 addressed below. Mr. Broussard has no objection to the proposed conditions of supervision.

Mr. Broussard did not enter into a plea agreement with the government. Mr. Broussard will ask the Court to merge the convictions at sentencing based on *United States v. Keen*, 104 F.3d 1111 (9th Cir. 1996) [1]. Mr. Broussard possessed the firearm and the ammunition during the same criminal episode.

For the reasons set forth below, the confidential supplement to the PSR that includes mitigation reports, Exhibit A, and Exhibit B, and for reasons that will be presented at the

[1] In *Keen*, the defendant could only be convicted for one violation of § 922(g)(1) when a loaded shotgun and additional ammunition was found at the same time in the defendant's hotel room.

sentencing hearing, Mr. Broussard will ask the court to impose a sentence that is “sufficient, but not greater than necessary” to achieve the sentencing mandate required by 18 U.S.C. § 3553(a).

## II. The Nature and Circumstances of the Offense Substantiate Mr. Broussard’s Argument Against the Four-Level Enhancement Pursuant to USSG 2K2.1(b)(6)(B)

The night of the February 20, 2023, was an unfortunate incident that was the result of Mr. Broussard’s struggle with his mental health and substance abuse disorder that could have ended tragically. The responding officers’ skill and professionalism allowed them to successfully diffuse a dangerous situation involving a firearm and reduced the risk of further harm.

Mr. Broussard was experiencing symptoms of his mental health diagnosis, which were exacerbated by the stimulants he ingested with his girlfriend, AV1. The circumstances and events of that night were nuanced, but appear to have resulted from Mr. Broussard’s psychosis, rather than from a domestic violence situation.

In order for the Court to apply the four-level enhancement under USSG 2K2.1(b)(6)(B), the government must prove Mr. Broussard intentionally pointed the gun at AV1 and that his conscious objective was to use the gun unlawfully against her.[2] Mr. Broussard was in mental health crisis when he possessed and waived AV1’s gun around the house. At times the gun was pointed in her direction, which was confirmed by witnesses due to the mark of the red laser attached to the gun. This conduct is clearly reckless and negligent; however, the evidence is insufficient to support a definitive finding that the act was intentional as opposed to reckless or negligent. The crime of Coercion requires a mental state of either intent or knowledge.[3] Based on

[2] Under Oregon law (ORS 161.085) "intentionally" or "with intent" means a person acts with a conscious objective to cause a specific result or to engage in particular conduct.

[3] Under Oregon law (ORS 161.085) “Knowingly” or “with knowledge,” when used with respect to conduct or to a circumstance described by a statute defining an offense, means that a person acts with an awareness that the conduct of the person is of a nature so described or that a

the facts, Mr. Broussard assumes the government's theory on Coercion is for the conduct involving the bathroom however, he will address additional enhancement arguments at the sentencing hearing if needed.

Even if the Court concludes Mr. Broussard's act was intentional, the government still must prove he had the requisite criminal mental state to commit the crimes. Under Oregon law Mr. Broussard could raise the affirmative defense of diminished capacity, which states "evidence that the actor suffered from a qualifying mental disorder is admissible whenever it is relevant to the issue of whether the actor did or did not have the intent which is an element of the crime."[4] Oregon law also permits the defense of voluntary intoxication if it negates the requisite mental state element of criminal conduct.[5] Diminished capacity and voluntary intoxication defenses apply to mental states of intent and knowledge.

Mr. Broussard has a history of paranoia symptoms from his mental health diagnoses which intensified when he used MDMA that night.[6] Mr. Broussard started experiencing paranoia approximately a year after his release from prison well before he began using controlled substances. For months prior to the incident, Mr. Broussard and AV1 both believed they were being followed and "gang stalked" by unknown people who were trying to extort them.[7] On

---

circumstance so described exists.

[4] ORS 161.300

[5] ORS 161.125

[6] Exhibit A of confidential supplement to the PSR, Dr. Merg Forensic evaluation
According to Dr. Merg, "It appears that Mr. Broussard developed an inadvertent stimulant induced psychosis which worsened over time and undermined his recognition of reality. Paranoia, including the belief that unknown people were out to kill him, became his reality and resulted in the behaviors that led to his arrest. It is my opinion that his ongoing substance misuse triggered and exacerbated psychotic symptoms which were distinct and independent of acute intoxication. His behavior was driven by paranoia caused by stimulant induced psychosis, and he was unable to recognize the reality of his situation."

[7] Exhibit B of Confidential Supplement to the PSR, investigation report interview of AV1 by FPD investigator.

February 20, 2023, during Mr. Broussard's psychosis, he took AV1's gun to protect them against the people he believed were stalking them.

After Mr. Broussard was confronted by law enforcement and removed from the house, the first person to describe the incident was AV1's mother. She indicated that Mr. Broussard had AV1's gun and was waiving it around. The body worn camera (BWC) footage of a nearby officer, captured AV1's mom's interview. She said "I saw him, like, laser her a couple of times". The officer followed up and asked her if she saw Mr. Broussard point the gun at AV1. She responded, "Well, he was like (inaudible) I mean, maybe he didn't, but I thought a couple times." When directly asked again if she saw him point the gun at AV1, she responded with inflection in her voice "a couple times" and appeared to motion while responding. Her visual response on the BCW footage is obstructed when she appeared to motion.[8]

A few minutes later, AV1's mother stated "you can't carry a gun around and go (AV1's mother made noises as she motioned waiving the gun around)…very dangerous".[9] She also visually demonstrated the same motion mimicking Mr. Broussard waiving the gun around during later interview with another officer.[10] Both visible movements appear to reenact waiving the gun in a manner that is consistent with reckless conduct as opposed to intentional pointing.

AV1 also confirmed Mr. Broussard was waiving the gun around. She stated, "He just kept pointing…he wasn't really pointing the gun at me, but he was pacing back and forth"[11] In later interviews, when AV1 was challenged by the officers that she was also high on drugs and were asking for the ecstasy AV1 did state Mr. Broussard pointed a gun at her to explain her animated

---

[8] Exhibit C, BCW at 21:07 to 21:08.
[9] Exhibit C, at 21:10.
[10] Exhibit D at 21:34.
[11] Exhibit E, at 21:20

presentation.[12] Based on the evidence, there is a factual dispute if Mr. Broussard acted intentionally or recklessly when the gun was pointed towards AV1 during Mr. Broussard's chaotic, psychotic behavior.

Police responded to what they believe was a domestic violence incident involving a firearm, based on their experience that is not an unreasonable assumption. In viewed in this light, it could be perceived that Mr. Broussard used AV1 as a shield when the police entered. However, when AV1 first described that part of the incident, she indicated Mr. Broussard was reaching for the gun when the officer approached the bathroom because she moved it off the counter under the sink.[13] Later, when she was asked to describe that event again, she said "that he was really trying to" while she demonstrated Mr. Broussard was reaching down for something, but she didn't finish her statement.[14] Based on Mr. Broussard's paranoid belief someone wanted to harm them, disbelief the responding officers were law enforcement, and the BWC footage from the bathroom, it could be perceived that, while misguided, Mr. Broussard's intent was to protect AV1 and himself. Thankfully for everyone involved, the officers' quick and skilled response leaves the parties without a definitive answer.

Mr. Broussard's former counsel likely objected to the relevancy of Paragraph 23 of the PSR because its inclusion could be interpreted to imply Mr. Broussard is a domestic abuser. This paragraph summarizes a written report that on April 10, 2023, law enforcement arrested Mr. Broussard on the federal indictment when dispatch received a disconnected 911 call from that address. The audio and BOEC log of that 911 call were not provided in discovery, however, it was Mr. Broussard, not AV1, who made the disconnected 911 call. When Mr. Broussard made the call,

---

[12] *Id.*
[13] Exhibit C at 21:06 "I threw it under the..because he was trying to grab it"
[14] Exhibit D at 21:33.

he was attempting to avoid a confrontation about him leaving the house. Other than the perceived nature of the February 20, 2023 incident there is no evidence that suggests Mr. Broussard was physically abusive in the relationship with AV1. Both AV1 and her mother repeatedly described that night as the first time Mr. Broussard acted that way during their three-year relationship. In multiple interviews on February 20, 2023, AV1's mother specifically denied she ever saw Mr. Broussard physically abuse her daughter including that night. She described him as a nice guy and described herself as a protective parent that wouldn't tolerate that type of behavior.

Mr. Broussard caused a chaotic and scary situation for AV1, her family, law enforcements, and for himself, but the situation appears to be the product of a combination of psychosis and drugs specific to that night.

**III. Mr. Broussard Has Made Positive Strides in Post Offense Rehabilitation, Even Though He Continues to Struggle and Readdress his Mental Health and Substance Use Disorders.**

Mr. Broussard's social history is outlined in detail in Dr. Merg's forensic report and the PSR. Mr. Broussard now recognizes he was fortunate to have family stability and support growing up but his mother and stepfather's misperception of his behavior as a child likely caused by attention-deficit/hyperactivity disorder (ADHD), and Mr. Broussard's perceived treatment by his family as a child led him to seek out acceptance and validation from outside his home. Mr. Broussard turned to the streets and a lifestyle that embraced drugs, guns, and hustling. This lifestyle led to Mr. Broussard dropping out of school and serving two years in juvenile detention. A few years later he was sentenced to 13 years in prison for possession a small amount of crack cocaine and firearms. At 33 years old, Mr. Broussard was released from prison with no education, no work skills, and no coping mechanisms for life outside of prison.

Mr. Broussard's traumatic experiences on the streets and in prison left him struggling with mental health symptoms and diagnoses including complex post traumatic stress disorder (CPSD) and persistent depressive disorder, with anxious distress. Mr. Broussard also continues to struggle with the symptoms from ADHD and substance use disorders which were prevalent before he served his prison sentence.

Mr. Broussard successfully transitioned from prison to the community and remained sober for approximately three years following his release from BOP. During this time, he got hired by Hillsboro Aviation by being upfront about his past during the interview process and throughout his employment. He became a valued employee based on his work ethic and personality while on the job and outside of work.

Towards the end of his term of supervised release, Mr. Broussard entered a new relationship and began using controlled substances. Mr. Broussard left his job at Hillsboro Aviation to pursue his passion in social services and to increase his earning potential, but his drug use delayed this plan.[15] Eventually Mr. Broussard began using drugs daily which exacerbated his mental health symptoms and led to the crisis he experienced on February 20, 2023.

Mr. Broussard was arrested on April 10, 2023. He was released from jail to the Northwest Regional Reentry Center (NWRRC) on June 1 and engaged in substance abuse treatment with Volunteers of America (VOA). Mr. Broussard stopped using controlled substances after his release. He has had no positive UAs for any controlled substances while on pretrial supervision, but Mr. Broussard began drinking alcohol which was not historically a problem for him until recently.

[15] Once Mr. Broussard left Hillsboro aviation, he helped AV1 clean houses and lived with her on the coast until his arrest.

Mr. Broussard focused on building his career to help at risk individuals after his release from jail. On June 23, 2023, Mr. Broussard was hired at Urban Alchemy as an onsite practitioner at an interim housing site where he worked directly with people experiencing homelessness. His position provided support with de-escalation, customer service, and conflict resolution within the community as well as support for his team. He became a lead outreach specialist, however, in September 2024, he was laid off due to budget constraints. During this time Mr. Broussard got certified as a peer wellness specialist, trauma informed specialist, and harm reduction /opioid overdose responder.

Mr. Broussard was hired by New Avenues for Youth in July 2025 to work directly with clients as a Drop in Coordinator. Once again, Mr. Broussard was upfront about his past record and pending case during the hiring process with human resources director, John O'Flaherty. Mr. Broussard was dedicated to helping clients on his caseload and was considered a valued as a member of their organization. He was also recognized as a team player. An example is when Mr. Broussard volunteered to cook for the participants and staff when there was an employment gap in the chef's position for approximately two months. This move also allowed Mr. Broussard to take a break from the intensity of working directly with at risk youth in the program. In May 2026 the staff at New Avenues gave Mr. Broussard a belt buckle as a sign of appreciation at the end of his temporary role in the kitchen.

Unfortunately, in June, Mr. Broussard was involved in a workplace incident with the assistant director, during which the two exchanged words and pushed one another. This led to an "involuntary separation" between New Avenues and Mr. Broussard. While facilitating the exchange of property between the parties, defense counsel met with Mr. O'Flaherty. He expressed that he and others were "heartbroken" over the way things ended with Mr. Broussard. Mr.

O'Flaherty could not provide many details about what led up to the conflict based on employment law restrictions, but he acknowledged Mr. Broussard's recent behavior was unusual, and we discussed that Mr. Broussard was under a lot of stress with the pending matters and the possibility he would return to prison.

During Mr. Broussard's employment at both Urban Alchemy and New Avenues, he temporarily changed positions due to work-related stress and the impact of vicarious trauma on his mental health. Shortly after Mr. Broussard was laid off at Urban Alchemy he was hospitalized for a suicide attempt in combination with suspected drug induced psychosis. Following his hospitalization, he entered mental health and substance abuse treatment. Mr. Broussard maintained another period of sobriety until he began using alcohol over a year later after his interlock device was removed.

Since Mr. Broussard's release from BOP in 2018 he has periodically struggled with substance use disorder, but this should not overshadow all the positive strides he made after his release. He got hired at Hillsboro Aviation, a well-respected company, as a convicted felon, fresh out of prison, and with no work history. He thrived there as an employee for years because he was a hard worker, respected for his honesty and transparency about his past, and easy to root for because he had turned his life around. Mr. Broussard found his passion in helping others who struggle with similar life experiences he faced before he went to prison and is committed to social service work. All the setbacks in Mr. Broussard's success have revolved around relapse of his substance use disorders and the effect it has on his mental health diagnoses. Relapse is a common occurrence in recovery, but Mr. Broussard has demonstrated post offense rehabilitation when he refrains from substance use.

## IV. Conclusion

At sentencing, Mr. Broussard will recommend a sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully Submitted this 19 day of August, 2026.

/s/Stephanie Pollan
Stephanie Pollan
Attorney for Ciedric Broussard